

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00042-CV

———————————————

ATMOS ENERGY CORPORATION, Appellant

V.

CHARLES L. PAUL, Appellee

On Appeal from the Probate Court
Denton County, Texas
Trial Court No. PR-2017-00587

Before Bassel and Wallach, JJ., and Gonzalez, J.[1]
Opinion by Justice Bassel

---

[1]The Honorable Ruben Gonzalez, Jr., Judge of the 432nd District Court of Tarrant County, sitting by assignment of the Chief Justice of the Texas Supreme Court pursuant to Section 74.003(h) of the Texas Government Code. *See* Tex. Gov't Code Ann. § 74.003(h).

## OPINION

## I.   INTRODUCTION

This appeal involves a dispute over the interpretation of a 1960 easement agreement that grants a right-of-way for the grantee to construct, maintain, and operate pipelines over and through 137 acres of property.  Appellee Charles L. Paul currently owns a portion of this property.  Atmos Energy Corporation, the current owner of the easement, sued Paul for violating the easement agreement after he denied Atmos access to construct a new pipeline.

In a single issue, Atmos appeals the probate court's granting of summary judgment in Paul's favor and rendering judgment that Atmos take nothing.  Atmos argues that the probate court erred because (1) under standard principles of contract interpretation, the unambiguous easement is a blanket easement that permitted Atmos to construct a new pipeline anywhere on the property, subject to the requirement that the use of the right does not unreasonably interfere with the property rights of the owner of the servient estate, and (2) Paul did not conclusively prove that the new line unreasonably burdened Paul's property.  We agree and reverse and remand.

## II.  BACKGROUND[2]

### A.  The 1960 Easement Agreement granted Atmos, as successor-in-interest to Lone Star Gas Company, a right-of-way and easement to lay multiple pipelines over and through 137 acres of land in Denton County.

In 1960, Atmos's predecessor-in-interest, Lone Star Gas Company, entered into a right-of-way and easement agreement (the Easement Agreement) with Paul's predecessors-in-interest.  In exchange for ninety dollars, the predecessors granted, sold, and conveyed to Lone Star Gas and its successors and assigns,

> the right of way and easement to construct, maintain and operate pipe lines and appurtenances thereto . . . over and through the following described lands situated in Denton County, State of Texas, to-wit:
>
> [137 acres.]
>
> TO HAVE AND TO HOLD unto said Grantee, its successors and assigns, so long as such lines and appurtenances thereto shall be maintained, with ingress to and egress from the premises, for the purposes of constructing, inspecting, maintaining, and replacing the property of Grantee above described, and the removal of such at will, in whole or in part.
>
> The said Grantor is to fully use and enjoy the said premises, except for the purposes hereinbefore granted to the said Grantee, which hereby agrees to bury all pipes to a sufficient depth so as not to interfere with cultivation of soil, and to pay any damages which may arise to growing crops or fences from the construction, maintenance and operation of said pipe . . . .  Should more than one pipe line be laid under this grant at any time, the sum of one dollar per lineal rod for each additional line shall be paid, besides the damages above provided for.

---

[2]We draw these allegations and facts from the parties' live pleadings and the summary-judgment evidence.  We refer to allegations in the pleadings only to more clearly outline the context for this dispute; we do not consider them evidence supporting summary judgment.  *See Laidlaw Waste Sys. (Dall.), Inc. v. City of Wilmer*, 904 S.W.2d 656, 660 (Tex. 1995).

**B.**   **Lone Star Gas laid Line W in 1960 along the southern border of Paul's property, and then in 2017, Paul denied Atmos access to install a new Line WD diagonally across his property.**

The summary-judgment record reflects that in 1960, pursuant to the Easement Agreement, Lone Star Gas installed Line W, a twenty-four-inch diameter gas pipeline, along the southern boundary of Paul's property.

At some point, the 137 acres burdened by the Easement Agreement were subdivided. According to the summary-judgment evidence, in 2001, Paul purchased 64 acres of this subdivided property. Atmos, as successor-in-interest to Lone Star Gas, currently owns the right-of-way and easement rights granted by the Easement Agreement.

Atmos alleged that in January 2017, it met with Paul about installing a new pipeline on Paul's property. The summary-judgment evidence reflects that the new pipeline (Line WD) would enter Paul's property approximately 950 feet north of Line W on his western boundary line and run diagonally southeast to approximately 575 feet north of Line W on his eastern boundary line. The cropped image below depicts the boundaries of Paul's property in green, Line W in red, and Line WD in white.[3]

---

[3]The blue lines depict a pipeline owned by an unrelated entity.

4



The Easement Agreement requires the payment of one dollar per lineal rod for any additional lines laid under that agreement. The summary-judgment record evidences that Atmos tendered Paul payment in the amount of $70.31 as payment for Line WD, which Paul rejected.

## C. Atmos sued Paul for breach of contract for denying it access to his property to install Line WD.

In July 2017, Atmos sued Paul for breach of contract, alleging that Paul had violated the Easement Agreement "[b]y denying [Atmos] access to the [p]roperty," "unlawfully interfer[ing] with [Atmos's] [e]asement rights," and threatening to delay the construction of the new pipeline. Atmos alleged that it was necessary for Atmos to construct a second pipeline because the demand for gas in Denton County and

5

North Texas greatly increased such that Line W, by itself, could not continue to adequately provide natural gas to all areas that it was originally designed to serve. Atmos alleged that Paul had claimed that the new Line WD was in excess of the rights provided for under the Easement Agreement.

After Atmos filed suit, the parties entered into a "Right of Possession and Use Agreement" (PUA) that allowed Atmos to access Paul's property to install Line WD, conditioned on the probate court's ruling on Atmos's right to use the land.[4] Pursuant to the PUA, Atmos has constructed Line WD on Paul's property.

## D.     Paul moved for a traditional summary judgment on Atmos's claim for breach of contract, arguing that he negated the breach element to the claim as a matter of law.

### 1.     In seeking summary judgment, Paul argued that the laying of Line W set the location and width of a single easement envisioned by the Easement Agreement and that Line WD is outside that easement.

Paul filed a traditional summary-judgment motion on Atmos's breach-of-contract claim. He admitted that he had denied Atmos access to his property. But he argued that he did not breach the Easement Agreement in doing so because (under his interpretation of the agreement), as a matter of law, the Easement Agreement does not permit the installation of the new line, Line WD.

---

[4]Atmos initially asserted a claim for violations of the Texas Utilities Code and requested a temporary injunction. It nonsuited these claims after the parties entered into the PUA. Atmos also asserted an alternative claim for condemnation; the parties agreed to sever that claim into a separate action pursuant to the PUA.

Under Paul's interpretation, the Easement Agreement is not ambiguous and created only "one 'right of way and easement'" that "allows for multiple pipelines, [but] not multiple easements." He acknowledged that the Easement Agreement "did not set [the easement's] location." But relying heavily on *Houston Pipe Line Company v. Dwyer*, 374 S.W.2d 662, 665–66 (Tex. 1964) (which we discuss in our analysis), Paul argued that Atmos's predecessor, Lone Star Gas, set the easement's location and the maximum pipeline diameter when it laid Line W in 1960. "Thus, when Atmos's predecessor installed its first pipeline (Line W) along the southern boundary of the Property, this act forever set both the location of the easement and the maximum diameter (24 inches) of any future-laid pipelines within it." He further argued that "[a]ny subsequent pipelines installed under the [Easement Agreement] must parallel the first pipeline and must be located within this easement."

In support of his motion, Paul filed an affidavit stating that at some point between 2002 and 2004, he began installing dog kennels south of his barn (where Line W is located) when an Atmos agent told him that he could not place a structure within Atmos's easement.[5] The agent told him that Atmos's easement was fifty-feet wide. Paul further stated by affidavit that between 2003 and 2004, Atmos installed another pipeline (Line X) parallel to and approximately ten feet south of Line W,

---

[5]The probate court sustained Atmos's objection to excerpts from Paul's deposition that Paul untimely filed on the day of the summary-judgment hearing. Paul does not challenge this ruling on appeal. Thus, we do not consider these excerpts on appeal.

7

between Line W and his property's southern boundary line. Thus, he argued, Atmos knew that it had to build this Line X within the same right-of-way established by the placement of the original pipeline under the Easement Agreement.

As to the question whether Line WD unreasonably burdens his land, Paul stated in his affidavit that "[t]he location of [Line WD] severely impacts [his] ability to develop the [p]roperty to its highest and best use." He argued generally that if the Easement Agreement authorized Atmos to "lay any number and diameter of new pipelines in any location on the [p]roperty every time an increased demand for gas made it necessary, the extent of its easement would never become fixed or definitely ascertainable." Paul contended that "[n]o reasonable buyer would seriously consider buying land that could be spider-webbed with an unlimited number of new pipelines at the drop of a hat"; citing *Dwyer*, he argued that any interpretation that grants "Atmos such a boundless right [is] unreasonable."[6]

### 2. Atmos responded to Paul's summary-judgment motion by arguing that the Easement Agreement granted a "multiple pipeline blanket easement" that does not specifically designate where pipelines are to be constructed.

Atmos argued that under governing contract-interpretation principles, the Easement Agreement granted a "blanket easement containing multiple pipeline

---

[6]Paul also cited Section 111.0194 of the Texas Natural Resource Code as "evidence of the Legislature's policy pronouncement that, barring 'express' provisions allowing a pipeline company to take multiple routes through a landowner's property, it is in the public interest to construe such [blanket] easements as creating a single and narrow easement corridor." *See* Tex. Nat. Res. Code Ann. § 111.0194. We address this statute in our discussion below.

rights" with "no limitations on where future pipelines can be placed"; it is a "multiple pipeline blanket easement." In Atmos's view, requiring all future pipelines to be laid within an arbitrarily imposed fifty-foot-wide area or "single and narrow easement corridor" improperly limits the number of pipelines that could be laid on the property, in direct violation of the express terms of the Easement Agreement.[7]

Atmos argued that Paul misinterpreted *Dwyer*. Although *Dwyer* stands for the proposition that the location and size of an easement may become fixed once it is installed under a blanket easement that authorizes only one pipeline, that proposition does not apply to the Easement Agreement because it authorized multiple pipelines. In the view of Atmos, single pipeline easements are different from multiple pipeline easements because the latter are "not fixed unless the easement instrument expressly fixes them." Atmos argued that the Easement Agreement granted the equivalent to "multiple floating easements."

Atmos also filed an affidavit signed by Drake Miller, an Atmos engineer. As to the incident relating to the dog kennels, Miller stated that he found no record or evidence of (1) an Atmos agent ever stating that the Easement Agreement required Atmos to install pipelines within a fifty-foot-wide area around the existing Line W or that the easement was limited to fifty feet in width, or (2) that any Atmos agent was

---

[7]Atmos filed excerpts from Paul's deposition wherein he had called the easement a "blanket easement." It also attached Paul's responses to Atmos's request for admissions wherein Paul had admitted that "the Easement does not purport to expressly provide for a defined area on the [property] in which a pipeline must be laid."

9

ever authorized to make such statements. As to Line X, Miller stated that although Atmos does operate a Line X pipeline, it is more than forty miles away from Paul's property at its closet point. Although Atmos had installed a replacement Line W next to the original Line W, it had never built or operated any other pipeline on Paul's property other than the new Line WD.

Miller's affidavit also included an explanation of various factors that went into Atmos's decision to route Line WD diagonally across Paul's property. Such factors included, among other things, the location of homes, barns, a creek, a pond, and other pipelines. His affidavit included a map showing certain property boundaries in green, Line W in red, other pipelines in blue, Line WD in white, and yellow tacks for various obstructions:



According to Miller's affidavit, the route chosen was the "best route to enable Atmos to construct, maintain, and operate Line WD while at the same time limiting the impact on the landowners [including Paul and surrounding landowners] burdened by the existing easements as much as reasonably possible."

## E. The probate court granted summary judgment and entered a final judgment that Atmos take nothing.

The probate court held a hearing, granted Paul's summary-judgment motion, and entered a final judgment that Atmos take nothing. The probate court also

> [found] and declare[d] that (1) the 1960 easement is not a blanket easement covering all of [Paul's] property; (2) [Atmos] exceeded its rights under the 1960 easement by installing the pipeline known as Line WD in its current location on [Paul's] property; and (3) [Paul] did not breach the 1960 easement by withholding his consent to the installation of Line WD in its current location on [Paul's] property.

Atmos now appeals.

## III. PRELIMINARY MATTER

We will first address the probate court's "find[ings]" and "declar[ations]" before turning to the standard of review. Neither party filed a claim for declaratory judgment in the probate court,[8] and the probate court's "findings" and "declarations" do not separate any grounds on which it granted summary judgment from other grounds that Paul asserted in his motion. Thus, the probate court's findings and

---

[8]Paul erroneously requested summary judgment on Atmos's claim for declaratory judgment in his summary-judgment motion; but Atmos asserted no such claim. Paul likewise did not assert a declaratory-judgment claim and, consequently, did not request that the probate court make any specific declarations in his summary-judgment motion.

11

declarations constitute findings of fact and conclusions of law that have "no place in a summary judgment proceeding." *See Linwood v. NCNB Tex.*, 885 S.W.2d 102, 103 (Tex. 1994); *see also State v. Easley*, 404 S.W.2d 296, 297 (Tex. 1966). A case resolved by summary judgment has not been "tried" with the scope of Texas Rule of Civil Procedure 296. *Smith v. Huston*, 251 S.W.3d 808, 821 (Tex. App.—Fort Worth 2008, pet. denied). For summary judgment to be rendered, there cannot be a "genuine issue as to any material fact" for a trier of fact to "find," and the legal grounds are limited to those stated in the motion and response. *IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440, 441 (Tex. 1997). Such findings and declarations are properly disregarded by the court on appeal. *See id.* at 441–42. Consequently, we do not consider the parties' arguments over whether the probate court erred in making such findings or conclusions. *See Peebles v. Advanced Wholesale Car Concepts, Inc.*, No. 05-99-00269-CV, 1999 WL 1212260, at *1 (Tex. App.—Dallas Dec. 17, 1999, no pet.) (mem. op., not designated for publication) (declining to address appellant's points of error relating to probate court's findings of fact when granting summary judgment).

## IV. STANDARD OF REVIEW

We review a summary judgment de novo. *Tex. Workforce Comm'n v. Wichita Cty.*, 548 S.W.3d 489, 492 (Tex. 2018). Summary judgment is proper when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if

12

reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

If a defendant, such as Paul, conclusively negates at least one essential element of a plaintiff's cause of action, then the defendant is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence that raises a fact issue. *Van v. Peña*, 990 S.W.2d 751, 753 (Tex. 1999).

## V. LAW GOVERNING EASEMENT INTERPRETATION

A property owner's right to exclude others from his or her property is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 700 (Tex. 2002). But a landowner may relinquish the right to exclude others by granting an easement, though the relinquishment is limited in nature. *Id.* Under Texas law, an easement is a nonpossessory interest in land that authorizes its holder to use property for only a particular purpose. *Id.* The easement holder's rights are limited to those that are expressed in the grant. *Lindemann Props., Ltd. v. Campbell*, 524 S.W.3d 873, 880 (Tex.

13

App.—Fort Worth 2017, pet. denied) (op. on reh'g). Thus, a party's use cannot exceed the rights expressly conveyed by the easement. *See Marcus Cable*, 90 S.W.3d at 700.

The law balances the rights of the parties to an easement by specifying that "[a] servient estate holder [the owner of the underlying fee] cannot interfere with the right of the dominant estate holder's [the holder of the easement] use of an easement for the purpose for which it was granted or sought." *Taylor Foundry Co. v. Wichita Falls Grain Co.*, 51 S.W.3d 766, 770 (Tex. App.—Fort Worth 2001, no pet.). "Any use by the servient estate holder that interferes with the exercise of the dominant estate holder's rights must yield." *Id.*; *see also Severance v. Patterson*, 370 S.W.3d 705, 721 (Tex. 2012) (op. on reh'g) ("Because the easement holder is the dominant estate owner and the land burdened by the easement is the servient estate, the property owner may not interfere with the easement holder's right to use the servient estate for the purposes of the easement.").

Our primary concern is to ascertain the true intentions of the parties as expressed in the instrument. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *Boland v. Nat. Gas Pipeline Co. of Am.*, 816 S.W.2d 843, 845 (Tex. App.—Fort Worth 1991, no writ). The rules of contract construction and interpretation apply to the interpretation of easement agreements. *Marcus Cable*, 90 S.W.3d at 700; *see also Sw. Elec. Power Co. v. Lynch*, No. 18-0768, 2020 WL 960993, at *6 (Tex. Feb. 28, 2020); *DeWitt Cty. Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999); *Lindemann Props.*,

14

524 S.W.3d at 880. The contracting parties' intentions, as expressed in the grant, determine the scope of the conveyed interest. *Marcus Cable*, 90 S.W.3d at 700–01; *see also Sw. Elec. Power Co.*, 2020 WL 960993, at \*6.

We must read an easement agreement as a whole in determining the parties' intentions and to carry out the purpose for which the easement was created. *See DeWitt*, 1 S.W.3d at 101; *Lindemann Props.*, 524 S.W.3d at 880. We examine and consider the entire writing to harmonize and give effect to all provisions so that none will be rendered meaningless. *Sw. Elec. Power Co.*, 2020 WL 960993, at \*6; *Coker*, 650 S.W.2d at 393; *see also Smith*, 251 S.W.3d at 823. Thus, no single provision alone is given controlling effect. *Coker*, 650 S.W.2d at 393. And unless the language is ambiguous, we rely solely on the written instrument. *Smith*, 251 S.W.3d at 823.

The language in an agreement is to be given its plain, grammatical meaning unless to do so would defeat the parties' intent. *DeWitt*, 1 S.W.3d at 101; *see also Sw. Elec. Power Co.*, 2020 WL 960993, at \*8 ("The starting point of any exercise in easement construction is the same as for contract interpretation: the easement's plain language."). When a court concludes that the contract language can be given a certain or definite meaning, the language is not ambiguous, and the court must interpret the contract as a matter of law. *Sw. Elec. Power Co.*, 2020 WL 960993, at \*6; *DeWitt*, 1 S.W.3d at 100; *Boland*, 816 S.W.2d at 845. A term is not ambiguous because of a simple lack of clarity. *DeWitt*, 1 S.W.3d at 100. An ambiguity also does not arise merely because parties to an agreement proffer different interpretations. *Sw. Elec.*

15

*Power Co.*, 2020 WL 960993, at \*6; *DeWitt*, 1 S.W.3d at 100. An ambiguity arises only after the application of established rules of construction leaves an agreement susceptible to more than one meaning. *Sw. Elec. Power Co.*, 2020 WL 960993, at \*6; *DeWitt*, 1 S.W.3d at 100. For an ambiguity to exist, both potential meanings must be reasonable. *DeWitt*, 1 S.W.3d at 100.

As specifically applicable to the present controversy, "Texas courts have held the failure to spell out all the terms in an easement with respect to the construction of additional pipelines does not render ambiguous or unenforceable the rights granted." *Boland*, 816 S.W.2d at 844 (citing *Strauch v. Coastal States Crude Gathering Co.*, 424 S.W.2d 677, 681 (Tex. App.—Corpus Christi–Edinburg 1968, writ dism'd)).

An easement's express terms, interpreted according to their generally accepted meaning, delineate the purpose for which the easement holder may use the property. *Marcus Cable*, 90 S.W.3d at 701; *see also Lindemann Props.*, 524 S.W.3d at 880. Nothing passes by implication "except what is reasonably necessary" to fairly enjoy the rights expressly granted. *Marcus Cable*, 90 S.W.3d at 701. If a particular purpose is not provided for in the grant, the holder of the easement may not use the property for that purpose. *See id.*

The emphasis that Texas law places upon an easement's express terms serves important public policies by promoting certainty in land transactions. *Id.* at 702. A potential purchaser of an easement must be able to safely rely upon granting language. *Id.* And those who grant easements should be assured that their conveyances will not

16

be construed to undermine private-property rights beyond what was intended in the grant. *Id.*

A use that falls outside the assigned purpose of the grant is not permitted simply because it provides a public benefit; permitting that use would circumvent the contracting parties' intent by disregarding the easement's express terms and the specific purpose for which it was granted. *See id.* If a use does not serve the easement's purpose, it becomes an "unauthorized presence on the land." *Id.* at 703. "Adhering to basic easement principles, we must decide not what is most convenient to the public or profitable to [an easement holder], but what purpose the contracting parties intended the easement to serve." *Id.* at 702; *see also Dwyer*, 374 S.W.2d at 665–66 (indicating that an easement allowing one pipeline to be laid, with the easement terminating upon removal of the pipeline, could never become fixed or definitely ascertainable if the grantee could increase the size of the pipe every time an increase in gas demand made such enlargement necessary). "Thus, the threshold inquiry is not whether the proposed use results in a material burden, but whether the grant's terms authorize the proposed use." *Marcus Cable*, 90 S.W.3d at 703.

But at the same time, Texas's public policy "strongly favors freedom of contract." *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 481 (Tex. 2017). This "paramount public policy" mandates that "courts are not lightly to interfere with this freedom of contract." *Id.* (quotation marks omitted). Parties have the right to contract as they see fit as long as their agreement does not violate the law or public

policy. *Id.* Absent compelling reasons, we must respect and enforce the terms of a contract that the parties have freely and voluntarily entered. *Philadelphia Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016). We are not permitted to rewrite an agreement or add to its language, making it mean something different than originally intended. *See Shields Ltd. P'ship*, 526 S.W.3d at 486; *Rubinstein v. Lucchese, Inc.*, 497 S.W.3d 615, 625 (Tex. App.—Fort Worth 2016, no pet.); *see also Fortis Benefits v. Cantu*, 234 S.W.3d 642, 649 (Tex. 2007) (indicating that courts should be "loathe" to judicially rewrite a contract). We cannot change a contract simply because we or one of the parties comes to dislike a provision or believes that something else is needed in the contract. *Rubinstein*, 497 S.W.3d at 625.

With these principles in mind, we turn to our analysis of the Easement Agreement.

## VI. THE PROBATE COURT ERRED BY GRANTING SUMMARY JUDGMENT.

In its sole point on appeal, Atmos argues that the probate court's granting of summary judgment on its breach-of-contract claim was error. Because Paul's summary-judgment motion focused on the breach element to Atmos's contract claim, our review is limited to whether Paul conclusively established that he did not breach the Easement Agreement when he refused Atmos access to install Line WD. To resolve this question: (1) we must interpret the Easement Agreement to determine whether it requires all pipelines to be laid along the same corridor that the original Line W was laid; and (2) if not, then we must determine whether the

18

summary-judgment record conclusively established that Line WD unreasonably burdens Paul's property. *See Marcus Cable*, 90 S.W.3d at 701, 703.

Because we conclude that the unambiguous Easement Agreement is a multiple pipeline blanket easement that does not require all pipelines to be laid along the same path as Line W and that Paul did not conclusively establish that Line WD unreasonably burdens his property, Paul did not conclusively negate the essential element of breach to Atmos's breach-of-contract claim. Thus, the probate court erred by granting summary judgment and entering a final judgment that Atmos take nothing.

## A. By its express terms, the unambiguous Easement Agreement granted a multiple pipeline blanket easement.

As an initial matter, there is no dispute in this case about whether the Easement Agreement authorizes Atmos to install a second line. By its express terms, the grant permits the grantee "to construct, maintain[,] and operate pipe *lines*" and to lay "more than one pipe line . . . at any time." [Emphasis added.] Thus, Atmos's use of the easement (the installation of Line WD generally) is a purpose for which the easement was expressly granted, and Paul does not contend otherwise. *See Marcus Cable*, 90 S.W.3d at 701; *Taylor Foundry*, 51 S.W.3d at 770. The dispute in this case focuses on where Line WD may, or must, be installed.

To answer that question, we look to the Easement Agreement because the original contracting parties' intentions, as expressed in the grant, determine the scope

of the conveyance. *See Marcus Cable*, 90 S.W.3d at 700–01. Atmos argues that the Easement Agreement is a "blanket easement" over the entire 137-acre tract of land, which includes Paul's property, and that because the blanket easement allows Atmos to construct additional pipelines across the property in the future, it had the right to install Line WD without regard to the location where Line W was originally constructed. We agree.

Under Texas law, a "blanket easement" is "[a]n easement without a metes and bounds description of its location on the property." *First Am. Title Ins. Co. of Tex. v. Willard*, 949 S.W.2d 342, 344 n.2 (Tex. App.—Tyler 1997, writ denied) (op. on reh'g).[9] "It is not necessary . . . for the easement description to be a smaller area than the entire servient estate." 2 Tex. Prac. Guide Real Estate Trans. § 15:19. "An easement over an entire servient tract is a 'blanket easement.'" *Id.* "Blanket easements have been commonly used in Texas history, particularly for long route utility projects such as pipelines and electric power lines." *Id.* "The purpose of a blanket easement is for the practical convenience of the easement holder to alter the exact location of the lines during construction." *Id.*; *see also* Cunningham, *supra* note 9, at 183 ("Historically, it was not uncommon for utilities and other infrastructure developers to obtain from landowners blanket easements that allowed improvements to be located anywhere on the subject property."). "The flip side of the flexibility provided for a blanket

---

[9] *See also* Megan M. Cunningham & Thomas J. Dougherty, *Unbounded Interests: The Limits of Blanket Easements*, Pratt's Energy Law Report, Jun. 2018, Vol. 18-6 at 184 (citing Law Easements, § 7.4 (2018)).

easement is the loss of control of exclusive use which the landowner otherwise enjoys." 2 Tex. Prac. Guide Real Estate Trans. § 15:19.

Here, the Easement Agreement contains no metes and bounds description specifying the location of an easement on the property. Rather, it conveys "the right of way and easement to construct, maintain and operate pipe lines and appurtenances thereto . . . over and through the following described lands situate[d] in Denton County, State of Texas, to-wit":

> 137 acres, more or less, out of the A.C. Madden Survey, Abstract No. 852
>
> R.M. Thompson Survey, Abstract No. 1578 and B.C. Barnes Survey, Abstract No. 85
>
> more fully described in deed from Sarah Anna Knox to M.A. Knox recorded in Volume 325, Page 520, Deed Records of said County, to which reference is here made for further description.

The Easement Agreement's reference to the entire 137 acres (of which Paul's property is only part) fits squarely within the definition of a blanket easement. *See First Am. Title*, 949 S.W.2d at 344 n.2.

By its express terms, the Easement Agreement permits the grantee to lay "pipe *lines*" and "more than one pipe" at "any time." [Emphasis added.] The Easement Agreement provides initial consideration of ninety dollars and then one dollar per lineal rod for any additional line laid in the future. There is no language limiting the location or width of the lines or requiring that any additional lines be parallel or

21

adjacent to the first line laid. Rather, the Easement Agreement identified the entire 137-acre tract as the property burdened by the servitude.

As a matter of law, the face of the Easement Agreement created an expansible, or multiple line, blanket easement. *See Boland*, 816 S.W.2d at 845; *Coastal States Crude Gathering Co. v. Cummings*, 415 S.W.2d 240, 241 (Tex. App.—Waco 1967, writ ref'd n.r.e.). "An 'expansible' easement is one which specifically grants to the easement holder the authority to place additional easement improvements across the servient tract from time to time." 2 Tex. Prac. Guide Real Estate Trans. § 15:80. "It is fairly common for utility easements to expressly grant the right to add additional lines from time to time on routes selected by the grantee." *Id.* "Such easements are enforceable 'expansible' grants" and vest in the grantee at the time of the grant. *Id.* (citing *Boland*, 816 S.W.2d at 845).

Under the plain language of the Easement Agreement, Paul's predecessors-in-title intended to burden their entire 137-acre tract of land and for the grantee to have the right to lay an unlimited number of pipelines as it may reasonably demand across the entirety of the predecessors' property by expanding the servitude each time upon the payment of the additional consideration of one dollar per lineal rod. *See Phillips Petroleum Co. v. Lovell*, 392 S.W.2d 748, 749–51 (Tex. App.—Amarillo 1965, writ ref'd n.r.e.).

22

**B.** **Atmos's use of the rights granted under the Easement Agreement, however, may not unreasonably interfere with Paul's property rights.**

The grant of a multiple pipeline blanket easement does not mean, however, that Atmos may use Paul's property however it deems fit without regard to the burden it places upon Paul's use of his land.

The majority of states, including Texas, that have chosen to impose limits on existing easement rights adopt some version of the "reasonable necessity test." *See* Cunningham, *supra* note 9, at 188–89. Under Texas law, "[a] grant or reservation of an easement in general terms implies a grant of unlimited *reasonable use* such as is *reasonably necessary and convenient and as little burdensome as possible to the servient owner.*" *Coleman v. Forister*, 514 S.W.2d 899, 903 (Tex. 1974) (emphases added); *see also Sw. Elec. Power Co.*, 2020 WL 960993, at *9 ("The holder of a general easement must utilize the land in a reasonable manner and only to an extent that is reasonably necessary."); *Lovell*, 392 S.W.2d at 749–51. "The grantee of an easement is entitled to such rights as are incident, essential or necessary to the enjoyment of such easement." *San Jacinto Sand Co. v. Sw. Bell Tel. Co.*, 426 S.W.2d 338, 344–45 (Tex. App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.). "An easement . . . gives no exclusive dominant right over the servient land unnecessary to the enjoyment of such easement, and the dominant owner (easement owner) *must make a reasonable use of the right so as not unreasonably to interfere with the property rights of the owner of the servient estate.*" *Id.* at 345 (emphasis added). This reasonable-use requirement "provides a vehicle for the servient land owner to

pursue recourse if the grantee utilizes the servient land in an unreasonable or unnecessary manner." *Sw. Elec. Power Co.*, 2020 WL 960993, at *9.

As it pertains to this case, Atmos is restrained by this rule of reasonable necessity when it selects a route for Line WD. What constitutes an unreasonable use of easement rights such that the grantee is unreasonably interfering with the property rights of the servient estate is a question that is inherently fact intensive. Paul expresses fear that Atmos may "spiderweb" his property with numerous pipelines. But we are faced with no actual controversy involving any such threat by Atmos in this case. *See id.* ("If at some point in the future SWEPCO [i.e., Southwestern Electric Power Company] utilizes the easements in a way that the Landowners believe is unreasonable and not reasonably necessary, or in a way that violates the express terms of the easements, the Landowners could at that point bring suit to enjoin SWEPCO's use of the easements."). And the fact remains, under Texas law, Atmos's right to use as much of the servient estate as it may reasonably demand for the purposes authorized by the easement vested at the time of the grant in 1960. *See* 2 Tex. Prac. Guide Real Estate Trans. § 15:80 (citing *Williams v. Humble Pipe Line Co.*, 417 S.W.2d 453, 454–55 (Tex. App.—Houston 1967, no writ) (holding that grant of expansible easement to lay additional pipelines vested in the grantee an interest in land)). Paul also acquired his portion of the 137 acres in 2001 with notice that the Easement Agreement was in his chain of title. *See Sw. Elec. Power Co.*, 2020 WL 960993, at *9 ("Because landowners purchase properties aware of any encumbrances, and

24

easements are a common encumbrance, landowners are charged with notice of easements that may encumber their property, including easements that do not contain a specific width but instead include general language.").

Accordingly, we conclude that the Easement Agreement granted Atmos the right to lay additional pipelines anywhere on Paul's property (which is only 65 acres out of the 137 acres in the grant) "as is reasonably necessary and convenient and as little burdensome as possible to [Paul,] the servient owner," and that such additional lines do not have to be in the same corridor as Line W. *See Coleman*, 514 S.W.2d at 903; *Lovell*, 392 S.W.2d at 749–51. Because the plain language of the Easement Agreement authorizes Atmos to install additional pipelines and does not fix the location of any such lines to the first line laid under the grant, Paul had to prove as a matter of law that the path that Atmos selected for Line WD unreasonably interferes with his property interests in order to negate the breach element of Atmos's contract claim as a matter of law. *See Severance*, 370 S.W.3d at 721; *Taylor Foundry*, 51 S.W.3d at 770. We address the question of whether Paul demonstrated that Atmos's selected route for Line WD unreasonably burdens his property as a matter of law below.

## C. Paul's interpretation of the Easement Agreement is not reasonable.

Before turning to that question (unreasonable burden of Line WD), we explain in detail why we reject Paul's interpretations of the Easement Agreement that underlie his contention that Atmos did not have the right to lay Line WD outside the corridor where Line W was originally laid. Paul argues that the Easement Agreement created a

25

single path through the property, not a blanket covering all 137 acres. Although Atmos may install multiple "pipe lines," he argues that it may do so only in this single corridor of reasonable width. He contends that this corridor was fixed when Lone Star Gas laid Line W along the southern boundary of his property.

Paul contends that his interpretation is the only reasonable one because it: (1) is consistent with the precedent established in *Dwyer*, 374 S.W.2d at 662–66 (discussed below); (2) is grounded in the generally accepted meanings of the terms "easement," "right-of-way," "over," and "through"; (3) does not render the right of "ingress" and "egress" meaningless; (4) is consistent with the compensation terms of the grant; and (5) is consistent with a requirement in the grant that the grantee pay for damages to growing crops and fences. As we explain below, Paul's interpretation is not reasonable because he misapplies the case law, misconstrues the nature of easements, and construes the language in the Easement Agreement too narrowly.

### 1. Paul's interpretation is based upon a misapplication of *Dwyer*, which does not involve a *multiple* pipeline blanket easement.

Relying on his interpretation of *Dwyer*, Paul contends that his interpretation is consistent with a "general rule" for "defining the extent of a pipeline company's easement rights where the agreement does not specify the easement's boundaries." *See id.* at 666 (brackets and quotation marks omitted). But Paul fails to recognize critical distinctions between the language of the granting instrument in *Dwyer* and this case and thus misapplies *Dwyer*.

In *Dwyer*, the landowners' predecessors-in-title granted a right-of-way and easement in 1926 to a pipeline company. *Id.* at 663. The pipeline company prepared the agreement, but the parties made changes with several critical deletions and interlineations. *Id.* The original language stated, "[landowner] does hereby grant, sell and convey unto [pipeline company] a right of way to lay, maintain, operate, repair ~~and remove~~ a Pipe Line for the transportation of gas." *Id.* The parties not only struck "and remove" from the granting clause but also deleted a paragraph that would have granted the pipeline company the right to construct additional pipelines over the lands. *Id.* They authorized a removal of the pipeline upon termination of the easement. *Id.* The instrument did not specify the size of the pipeline, did not contain any metes and bounds description, and did not define the course or direction for the pipe to follow. *Id.*

The pipeline company laid, in 1926, a line with an eighteen-inch diameter. *Id.* In 1959, the pipeline company removed the old, low-pressure pipe and installed a thirty-inch, high-pressure pipe along the same course as the 1926 pipeline. *Id.*

The landowners sued to remove the easement as a cloud on their title and to obtain a declaration that the easement terminated as a result of the pipeline company removing the eighteen-inch pipe and replacing it with the thirty-inch pipe. *Id.* The parties filed competing summary-judgment motions; the probate court granted the pipeline company's motion and denied the landowners' motion. *Id.* The court of appeals reversed the probate court's rulings, and the Supreme Court of Texas

27

affirmed that reversal. *Id.* at 662, 666. The issues on appeal were whether the pipeline company had terminated the easement by removing the first pipe and exceeded its rights by installing the larger pipe.

The Supreme Court of Texas concluded that the pipeline company "was not authorized to remove this 18-inch line initially constructed and replace it with a line of substantially greater size." *Id.* at 666. Quoting Thompson on Real Property, Perm. Ed. § 681, the court explained,

> A grant in general terms of a right to lay a pipe for the purpose of conducting water across the land of the grantor without specifying the place for laying it or the size of the pipe is defined and made certain by the act of the grantee in laying down the pipe; and after he has once laid the pipe with the acquiescence of the grantor, the grant which was before general and indefinite becomes fixed and certain and the grantee [cannot] change the easement either by relaying the pipe in another place or by increasing its size.

*Id.* The new line necessitated the digging of a ditch thirty-six to forty inches in width, widening the ditch, and placing the pipe two feet deeper. *Id.* at 665. The supreme court concluded that "when [the pipeline company] constructed its 18-inch pipeline with the consent and acquiescence of the plaintiff, the extent of defendant's easement rights under the 1926 agreement became fixed and certain." *Id.* at 666.

Paul, applying *Dwyer*, argues,

> The 1960 Easement Agreement does not define the metes and bounds of the easement. But when Atmos's predecessor laid its pipeline with the acceptance of [Paul's predecessors-in-title], the easement "which was before general and indefinite" became "fixed and certain." *Dwyer*, 374 S.W.2d at 666. Atmos cannot chose a new easement route.

28

In other words, he argues that there is only one path or corridor for all pipelines to be laid under the Easement Agreement, and that this path or corridor was set by Line W. *Dwyer* does not stand for this proposition. Part of the error in Paul's analysis is that he erroneously construes the terms "easement" and "right-of-way" to essentially mean a path, which we address below. But his error is also based on a misreading of *Dwyer*.

We agree that, although not expressly noted by the *Dwyer* court, the lack of any metes and bounds description for the easement in that case demonstrated that it involved a blanket easement. *See First Am. Title*, 949 S.W.2d at 344 n.2. The blanket easement afforded the pipeline company in *Dwyer* the flexibility to determine a location for the easement as it was laying the pipe with the acquiescence of the owner of the servient estate. *See* 2 Tex. Prac. Guide Real Estate Trans. § 15:19. The same is true with respect to Line W in the instant case.

But the fact that *Dwyer* and the instant case both involve blanket easements does not mean that the location of Line W in this case set the location for all future lines under the Easement Agreement. Rather, *Dwyer* is distinguishable because the granting language in *Dwyer* provided for only a single pipeline—it did not involve a multiple pipeline expansible easement. *Dwyer*, 374 S.W.2d at 663. In this case, the Easement Agreement expressly provides for multiple "pipe *lines*." The parties agreed that "[s]hould more than one pipeline be laid under [the] grant at any time, the sum of one dollar per lineal rod for each additional line" would be paid. The *Dwyer* court did not address the question of whether the location of a first line laid under a multiple

29

pipeline blanket easement set the location of *additional* pipelines laid under the grant; it addressed the location of the *one and only* pipeline permitted by the grant in that case and, more specifically, whether the easement had been *terminated* by the pipeline company's removal and replacement of the first pipe with a larger pipe.

*Dwyer's* principle holding—that the location of an easement becomes fixed and certain when the pipeline is laid when the easement does not specify a location—is consistent with our interpretation that the Easement Agreement created a multiple pipeline blanket easement that does not require all lines to be laid in the same corridor of the first line installed under the grant. But Lone Star Gas's laying of Line W in 1960 did not set the location of every additional pipeline laid in the future. Rather, under the Easement Agreement, the servitude is expanded each time Atmos pays the additional consideration (one dollar per lineal rod) to install a new pipeline. *See Lovell*, 392 S.W.2d at 749–51. Essentially, when Atmos installs a new pipeline, the blanket easement provides Atmos with the flexibility to select a reasonable route, based on the conditions then existing, to install the new line. *See Coleman*, 514 S.W.2d at 903; *Lovell*, 392 S.W.2d at 749–51. The omission of any specific location within the 137 acres for any of the pipelines was deliberate and forward-looking.

Other courts have distinguished *Dwyer* as we do. In fact, in *Southwestern Electric Power Company*, the Supreme Court of Texas distinguished the utility easements in that case from *Dwyer* because they "contemplate[d] future construction and installation of new poles and additional lines," making SWEPCO's easements "distinguishable from

the easement in *Dwyer*."[10]  2020 WL 960993, at *7.  *See also Orange Cty. v. Citgo Pipeline Co.*, 934 S.W.2d 472, 476 (Tex. App.—Beaumont 1996, writ denied) (stating that *Dwyer* was distinguishable because the easement in *Dwyer* did not provide for the size of the pipe and, thus, could not be replaced with a larger pipe whereas in *Orange County*, the instrument "specifically provide[d] for multiple pipelines, and [for] the landowner [to] receive[] compensation for each additional pipeline"); *Boland*, 816 S.W.2d at 845 (distinguishing *Dwyer* because the grant in *Boland* gave the right to operate, maintain, repair, alter, replace, move, and remove an initial pipeline and any additional pipeline at route or routes selected by grantee); *Strauch*, 424 S.W.2d at 682 (distinguishing *Dwyer*'s holding that the easement rights became fixed and certain when the first pipe was laid because *Dwyer* involved "[t]he right to lay only one pipe line" and the easement did not grant the right to remove and replace the original pipe with a larger pipe); *Cummings*, 415 S.W.2d at 242–43 (noting, in case involving right to lay, repair, maintain, operate, and remove "pipelines" for oil or gas transportation, that *Dwyer* is "distinguishable" on its facts); *Lovell*, 392 S.W.2d at 751 (distinguishing *Dwyer* because it "involved a single line grant," which is not "applicable to a multiple line grant").

---

[10]On March 2, 2020, Atmos filed Appellant's Unopposed Motion for Leave to File Post-Submission Letter Brief Regarding New Opinion from the Texas Supreme Court, requesting leave to file a post-submission letter brief to apprise this court of *Southwestern Electric Power Company*.  Because this opinion addresses that case, the motion is denied.

*Dwyer* does not stand for a rule of universal application that once the first pipeline is installed under a multiple pipeline blanket easement, the servitude can never be expanded such that the location of all pipelines must be along the same path of the original, even though the granting instrument grants an unlimited number of pipelines without specifying the location of such pipelines. *Dwyer* does not abolish multiple pipeline, expansible blanket easements, as Paul's interpretation would require us conclude. Stated differently, Atmos (as Lone Star Gas's successor-in-interest) retained its vested interest in all 137 acres after Lone Star Gas installed Line W along the southern boundary line of Paul's property. *See* 2 Tex. Prac. Guide Real Estate Trans. § 15:80; *Williams*, 417 S.W.2d at 454–55.

A grant may authorize a use greater than the one actually used, and such prior use does not nullify the greater rights conveyed in the grant. *See Sw. Elec. Power Co.*, 2020 WL 960993, at *7; *Dwyer*, 374 S.W.2d at 665 (distinguishing *Knox v. Pioneer Nat. Gas Co.*, 321 S.W.2d 596, 598–602 (Tex. App.—El Paso 1959, writ ref'd n.r.e.) on grounds that "the language of the grant [in *Knox*] clearly gave the grantee a right in excess of the one actually used[;] whereas, there [was] no language in the [*Dwyer*] agreement [that could] be construed to permit the grantee a right in excess of the right actually used[—]that is the right to increase the size of the pipe in excess of 18 inches in diameter."). According to the Supreme Court of Texas, "express easements by conveyance are, by their very nature, forward-looking." *Sw. Elec. Power Co.*, 2020 WL 960993, at *7. "[W]hen easements are negotiated between two parties, it is assumed

that the parties contemplated changes in the use of the servient tenant by the normal development in the use of the dominant tenement." *Id.* (quotation marks omitted). Here, the Easement Agreement gives Atmos a right (to lay multiple lines at any time over and through 137 acres) in excess of the one actually used (laying only a single pipeline along the southern boundary line). Atmos still has the greater rights as conveyed in the Easement Agreement, despite the fact that Atmos (and its predecessors) had installed and operated only Line W since 1960.[11]

Accordingly, Paul's analysis is grounded in a fundamental misunderstanding of what questions *Dwyer* resolved, how it resolved them, and how *Dwyer* applies, if at all, to multiple pipeline blanket easements. Our interpretation of the Easement Agreement is consistent with the principles set forth in *Dwyer*. Lone Star Gas's laying of Line W, the first pipeline, did not set the location of future pipelines authorized by the Easement Agreement because the grant imposes no such limitation and neither does *Dwyer*.

### 2. We reject Paul's argument that the right to lay "multiple pipelines" is distinct from "multiple routes" because it renders provisions of the Easement Agreement meaningless.

To reconcile his interpretation with the language authorizing the grantee to lay "pipe lines" and "more than one pipe line" "at any time" for "one dollar per lineal rod for each additional line," Paul argues that the "right to lay multiple lines does not

---

[11]The same is true even if we assume that Atmos installed Line X parallel with and ten feet south of Line W, as Paul contends.

imply the distinct right to create multiple routes over the property." Thus, he argues, although the Easement Agreement permits multiple pipelines, they must all be laid within a single corridor. We disagree.

To support his position, Paul cites our opinion in *Boland* to argue that if the parties intended to grant Atmos the right to select additional routes, they had to state so expressly by acknowledging multiple "routes" in the grant. We disagree with Paul's reading of *Boland*. In that case, a 1959 easement allowed the grantee to "construct[,] . . . reconstruct, operate, maintain, repair, alter, replace, move and remove an initial pipeline, and any additional pipeline described by Grantee . . . at route or routes selected by Grantee." 816 S.W.2d at 844. The agreement's property description was a metes and bounds description of the entire eighty-eight-acre tract. *Id.* Litigation ensued when the grantee sought to lay a fourth pipeline in a new location. *Id.* We held that the trial court did not err by holding as a matter of law that the pipeline company was entitled to lay its fourth pipeline at the location of its choosing and finding that the 1959 agreement created a multiple-line perpetual right-of-way easement in favor of the grantee. *Id.* We explained that the granting instrument was clear that the "grantor intended to burden the land not only with additional pipelines but with additional routes selected by grantee." *Id.* at 845.

Although the instrument in *Boland* included the language, "at route or routes selected by Grantee," nothing in that opinion stands for the proposition that such language *must* be included in order to interpret an easement as permitting multiple

34

routes. In the Easement Agreement, the right to multiple routes is embodied in the granting instrument itself by virtue of the fact it is a multiple pipeline blanket easement.

The language in *Boland* was more explicit, but the language in the *Boland* grant is not required when the intent to convey a multiple pipeline, expansible blanket easement is otherwise clear in the grant. *See Moody v. Phillips Petroleum Co.*, 594 S.W.2d 189, 190–91 (Tex. App.—Amarillo 1980, writ ref'd n.r.e.) (holding easements—which granted rights to lay, maintain, inspect, erect, operate, and remove a pipeline or pipelines over, through, upon, under and across the landowner's property with additional consideration of fifty cents per rod if any such pipeline or pipelines are laid at any time—were unambiguous "expansible multiple line easements" and rejecting argument that the easements were ambiguous because they omitted the number of pipelines, the course of such lines, the width of the easements, and the term "additional" in reference to pipeline); *Strauch*, 424 S.W.2d at 681 (holding that pipeline company was authorized to lay a second line fifteen feet east and parallel to a first line when "the grant of the right at any time to lay and maintain an additional pipe line or pipe lines alongside" the first pipeline created an "expansible easement" and expressly permitted the company to change the size of its pipes); *Crawford v. Tenn. Gas Transmission Co.*, 250 S.W.2d 237, 237–41 (Tex. App.—Beaumont 1952, writ ref'd) (holding that instrument authorizing "one or more additional lines of pipe adjacent to and parallel with the first pipe line laid by grantee" with payment of one dollar per

35

lineal rod for such additional lines did not "limit the pipe line operations of the [company] to any specific width" and "any attempt by the courts to limit the [company] to a certain portion of the land would alter the stated purpose for which the grant was made").

Paul also cites to *Cummings* to argue that an appellate court "recognized a pipeline company's power to lay additional lines, but limited the pipeline company's power to lay new lines to a strip of land of reasonable width (60-foot maximum)." *See* 415 S.W.2d at 241, 244. Paul misconstrues *Cummings*. In the trial court, the pipeline company in *Cummings* obtained injunctive relief prohibiting the landowners from interfering with the new pipelines' construction. *Id.* at 241. The injunction "permitted [the pipeline company] to immediate possession under its alternate plea for condemnation upon the part of a 60-foot right of way not covered by the prior [injunction] ruling on a 16 1/2-foot-wide strip through the cultivated land." *Id.* The sixty-foot right-of-way merely referred to the portion of the landowners' property condemned to install the new pipelines. *See id.* Contrary to Paul's suggestion, *Cummings* does not state that the appellate court limited the scope of the easement grant to a "reasonable width" of sixty feet.

Instead, *Cummings* supports our interpretation of the Easement Agreement. The granting language of the easements in that case provided "the right-of-way or easement and privilege, to lay, repair, maintain, [o]perate and remove a pipeline or pipelines for the transportation of oil or gas." *Id.* at 242. The language continued,

36

"Should more than one pipeline be laid under this grant at any time [sixty-six dollars] shall be paid for each additional line so laid, besides the damages above provided for." *Id.* The original grantee laid a pipeline in 1921, and litigation ensued in 1965 when its successor attempted to install two additional pipelines. *Id.* at 241. "The only issue before the trial court [when ruling on summary judgment] was whether or not each of the easements created multiple pipeline grants with the right in the future to expand the servitude." *Id.* at 242. The appellate court held that it did. *Id.*

We disagree with Paul's argument that the Easement Agreement permits only a single path or corridor for all pipelines for more reasons than it is unsupported by the cases that he cites. His interpretation also abrogates the provisions identifying the encumbered property as the entire 137-acre tract of land and authorizing the grantee to lay "pipe lines" and "more than one pipe line" "at any time" for "one dollar per lineal rod for each additional line." Ignoring this language violates the well-established interpretation principles that prohibit us from disregarding the language of the grant. *See Coker*, 650 S.W.2d at 393; *Smith*, 251 S.W.3d at 823; *see also Lovell*, 392 S.W.2d at 750 ("For us to hold . . . that the plural language 'pipe lines' was intended by the parties to mean only those laid in 1944 under that grant . . . would be to completely disregard the language providing: 'at any time or times' and the provision for payment of the designated amount per rod for the laying of a pipe line or pipe lines at any time or times.").

37

Other courts agree that the interpretation advanced by Paul would require us to abrogate the language of the Easement Agreement. For example, in *Lovell*, a deed granted Phillips Petroleum the right to lay "a pipe line, or pipe lines" "over, through, upon, under and across" property described by reference to a survey. 392 S.W.2d at 749. The deed provided for initial consideration of five dollars and fifty cents per rod for any pipe lines laid "at any time." *Id.* Litigation ensued when the subsequent landowners refused payment tendered by Phillips Petroleum for new pipeline construction. *Id.* The court of appeals reversed the trial court's granting of the landowners' summary-judgment motion and rendered judgment for Phillips Petroleum. *Id.* at 752. The court construed the deed "so as to give effect to all parts thereof" and "harmoniz[ing] all provisions therein," and held that the deed created a "multiple line grant[] giving the right in the future to expand the servitude by the payment of further consideration for such expansion." *Id.* at 749–51. The court explained that holding otherwise would require it to "completely disregard" and "strike down" the language "or pipe lines," "or times," "for each separate line so laid," and the provision requiring the payment of fifty cents to expand the servitude. *Id.* at 750. Paul's interpretation likewise requires us to disregard and strike down the similar language in the Easement Agreement.

Similarly, in *Lone Star Gas Company v. Childress*, Lone Star Gas acquired by deed "the right of way and easement to construct, maintain and operate pipe lines" over and through a 670-acre tract of land. 187 S.W.2d 936, 937 (Tex. App.—Waco 1945,

no writ). The deed, which is nearly identical to the Easement Agreement, provided that future pipelines could be laid "at any time" for additional payment: "Should more than one pipe line be laid under this grant at any time, the sum of twenty-five cents per lineal rod for each additional line shall be paid . . . ." *Id.* at 938. The landowners sued seeking to enjoin the gas company from using any portion of their land not included in the right-of-way, which the trial court had determined was thirty feet wide. *Id.* at 937.

In reversing the trial court's grant of injunctive relief to the landowners, the appellate court concluded that the trial court erred by "re-defin[ing] the terms of the grant and restrict[ing] the use granted by the instrument." *Id.* at 940. The court explained that the deed "did not stipulate that the [gas company] should confine its operations to a strip of land thirty feet wide." *Id.* at 939–40. Rather, the deed granted the gas company the right to "construct, maintain and operate pipe lines . . . over and through the following described lands"—the 670-acre tract. *Id.* at 937, 940. Thus, the gas company was "entitled to use in the future as much of the land as each occasion may reasonably demand." *Id.* at 940; *see also Harris v. Phillips Pipe Line Co.*, 517 S.W.2d 361, 362–65 (Tex. App.—Austin 1974, writ ref'd n.r.e.) (holding that Phillips could lay a new line fifteen feet from of an old line because the grant, which permits "pipe lines," is broad and does not limit the number of lines or specify a width for the expansible easement).

Paul seeks to redefine the nearly identical language in the Easement Agreement in a manner analogous to the landowners' argument in *Childress* and to distinguish that case. Specifically, Paul argues that in *Childress*, the appellate court "merely rejected injunctive relief confining new pipelines to a 30-foot-wide strip when more space was 'reasonably' needed for additional lines." Paul misconstrues *Childress* because the court expressly stated that the gas company was entitled to use as much of the land as *each occasion* reasonably demanded; it did not limit such use to any specific strip of land of "reasonable" width on the property. *See Childress*, 187 S.W.3d at 939–40.

Paul also tries to sidestep many of the cases we have cited to explain our interpretation of the Easement Agreement, such as *Moody*, *Strauch*, and *Lovell*, by claiming that they deal with whether an existing "easement strip was 'expansible' to accommodate new lines, not whether the pipeline company could create new paths anywhere on the property." This argument misconstrues the nature of a multiple line, or expansible, easement. It is not the size of the original strip, as Paul calls it, that is expanding. Rather, it is the amount of land burdened with an actual pipeline that is being expanded, regardless of any "strips" used for prior pipelines.

Accordingly, we conclude that it is not necessary for a multiple pipeline blanket easement to expressly state that the grantee is entitled to multiple routes in order for the grantee to lay a subsequent line in a location different from the first line laid under the grant in the absence of express language in the grant imposing that limitation. We reject Paul's argument that the "right to lay multiple lines does not imply the distinct

40

right to create multiple routes over the property" under this Easement Agreement because it is contrary to the very nature of multiple pipeline blanket easements under Texas law.

3. **Paul's interpretation is inconsistent with the plain, ordinary, and generally accepted meanings of "over," "through," "right-of-way," and "easement."**

We now turn to the root cause of Paul's erroneous interpretation of the Easement Agreement. Paul focuses on the language in the Easement Agreement wherein the grantors conveyed "*the* right of way and easement" to contend that there was only one (the) path or route granted. [Emphasis added.] He contends that the plain, ordinary, and generally accepted meanings of "right-of-way" and "easement" were, in the 1960s, "a space of conventional width" for one or more lines and a "way" or path, respectively, according to a 1968 version of Black's Law Dictionary. Paul parses the terms of the Easement Agreement too narrowly and misundertands the nature of easement rights.

First, Paul interprets "right-of-way" to mean "a space of conventional width" by cherry picking a portion of the 1968 definition relating to railroads that stated an easement for tracks is "a space of conventional width for one or more railroad tracks." *Right of Way*, Black's Law Dictionary (4th ed. 1968). But Black's broader definition of "right-of-way" generally meant "*a servitude* . . . by virtue of which one has *a right* to pass . . . through the estate of another." *Id.* (emphases added). "[It] is the *right of passage* over another [person's] ground" and "the mere intangible *right* to cross,

41

a *right* of crossing, a *right* of way." *Id.* (emphases added). The term connoted the *granting of a right to* pass through, over, and to cross another's property; it does not mean a specific path. The definition is the same today. *See Right-of-Way*, Black's Law Dictionary (11th ed. 2019) ("The right to pass through property owned by another" and "The right to build and operate a railway line or a highway on land belonging to another"). Thus, the dictionary definition of "right-of-way" was not as narrow as Paul contends.

Second, Paul likewise misconstrues the 1968 definition of "easement" to mean "way" or "path" by picking out the word "way" from a series of definitions of the term easement. Again, the 1968 Black's Law Dictionary generally defined easement more broadly as "[a] *right* in the owner of one parcel of land . . . to use the land of another for a special purpose not inconsistent with a general property in the owner." *Easement*, Black's Law Dictionary (4th ed. 1968) (emphasis added). Another definition stated that an easement was "[a] *privilege*, service, or convenience which one neighbor has of another . . . as a way over his land, a gate-way, water-course, and the like." *Id.* (emphasis added). And, among other things, an easement was defined as "[a] *liberty, privilege, or advantage* without profit, which the owner of one parcel of land may have in the lands of another." *Id.* (emphasis added). Easement has the same meaning today. *See Easement*, Black's Law Dictionary (11th ed. 2019) ("An interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose . . . ."). Once again, Paul focuses on narrow

definitions that support his position while ignoring the more prevalent definitions that undermine his argument. An easement is a nonposessory interest in real property; it is not simply a synonym for "way" or "path."

Third, Paul is impermissibly giving the term "the" in reference to "right-of-way" and "easement" controlling effect while disregarding the broader meaning of these terms and the additional plain language of the Easement Agreement permitting multiple pipleines to be laid "over" and "through" the entire 137-acre tract for new compensation. *See Coker*, 650 S.W.2d at 393. We interpet "the right-of-way and easement" in the Easetment Agreement to mean that the grantors conveyed *the right* "to construct, maintain and operate pipe lines . . . over and through" the 137-acre tract. Our construction gives effect to all provisions in the agreement whereas Paul's does not.

Paul similarly argues that the terms "over" and "through" generally mean path, not a spiderweb.[12] But he again selects a meaning that suits his purposes while ignoring others. "Over" means, among other things, "from one point to another across an intervening space," "above," "so as to cover, conceal, or affect the whole

---

[12]Paul cites no "authority" for this proposition and instead offers an illustration by quoting a song: "Over the river, and through the wood, to Grandmother's house we go; the horse knows the way to carry the sleigh through the white and drifted snow." His analogy is both unhelpful and inapt. Among other things, while a horse carrying a sleigh may make or follow a path along its journey, neither the making nor following of a path defines "over" and "through." The horse may make or follow any path "over" the river and "through" the woods, including by making or following a spiderwebbed path, by making or following one of many different paths, or by making a new path.

43

surface," and "from beginning to end." *Over*, Webster's Third New Int'l Dictionary (2002). "Through" indicates, among other things, "from one side to another," "from one end or boundary . . . to another," "over the whole distance," and "from beginning to end." *Through*, Webster's Third New Int'l Dictionary (2002). The broader definitions of "over" and "through" embody the entirety of the land identified in the easement—the 137-acre tract.

When we apply the generally accepted definitions of the words, the language "*the* right of way and easement" "over" and "through" the 137-acre tract does not limit the grantee's right to use only a single corridor of reasonable width to lay multiple pipelines. The generally accepted meanings of these terms are consistent with our interpretation of the Easement Agreement as granting a multiple pipeline expansible blanket easement above the whole surface, from one end of the property to the other. "*The* right of way and easement" meant that the grantors conveyed to the grantee the right to pass over and through the property (right-of-way) and to use the 137-acre tract (easement) for the purposes expressly set out in the Easement Agreement. "The" right is exercised and the amount of the servient estate used (and the easement) is *expanded* every time Atmos pays the "one dollar per lineal rod" for each additional line. *See Lindemann Props.*, 524 S.W.3d at 881 (rejecting landowner's argument that the easement's use of "a" and "said" authorized the placing of only a single tower because, although they are singular words, the landowner's interpretation

44

focused exclusively on the meaning and effect of only those terms while completely disregarding the meaning and effect of others).

Accordingly, we reject Paul's argument that "the right of way and easement" "over and through" the lands restricted Atmos to a single path that was established by the first line laid for all pipelines laid under the grant because his interpretation is contrary to the generally accepted meanings of these terms.

### 4. Paul's contention that our interpretation renders the right of "ingress" and "egress" meaningless is incorrect.

Paul argues that interpreting the Easement Agreement as granting a blanket easement over the entire 137 acres renders the reference to "ingress" and "egress" held by the grantee to be meaningless because these rights are "completely unnecessary and meaningless" if the "right-of-way" and "easement" were the "entire 137 acres." Again, we disagree.

Paul's argument mistakes "blanket easement" to mean the existence of an *easement* that grants unrestricted use of the entire 137-acre tract. This is not what "blanket easement" means. As we explained above, a blanket easement affords the grantee the flexibility to select a route for the pipeline (or other utility) being installed. The grantee does not have a free-ranging use of the remainder of the land described in the granting instrument. In the case of instruments granting the right to lay multiple lines, once the grantee installs a line under the blanket easement, the location of the easement with respect to that line becomes fixed and certain. The grantee still

45

does not have an *easement* on the remainder of the land described in the granting instrument—it merely has a vested interest in such land to use it for the purposes authorized by the instrument.

An easement authorizes its holder to use another's property only for a "particular purpose." *Marcus Cable*, 905 S.W.3d at 700. Because "blanket easements" do not equate to easements over the entire property regardless of where a line is actually installed, instruments like the Easement Agreement grant the grantees the incidental right of ingress and egress so that the holder of the easement can reach the line it has installed. Here, the pipelines installed do not cover the entirety of Paul's property. The right of ingress and egress expressly grants Atmos the incidental right to enter and exit the premises, including the portion were no pipeline is located, "for the purpose of constructing, inspecting, repairing, maintaining, . . . replacing," and "remov[ing]" each pipeline. *See Egress*, Black's Law Dictionary (11th ed. 2019) ("The act of going out or leaving" and "The right or ability to leave; a way of exit"); *Ingress*, Black's Law Dictionary (11th ed. 2019) ("The act of entering" and "The right or ability to enter; access"). So while "the right of way and easement" granted Atmos the right to "construct, maintain[,] and operate pipe lines and appurtenances thereto" over and through the 137-acre tract, the right of ingress and egress delineates the incidental purposes for which Atmos may enter Paul's property under the grant (i.e., to construct, inspect, repair, maintain, replace, and remove the pipelines).

Accordingly, we reject Paul's argument that interpreting the Easement Agreement to mean that additional lines laid under the grant are not tied to the location of Line W, the first line laid, renders the right of ingress and egress meaningless. Our interpretation continues to give effect to all terms in the grant, including the right of ingress and egress.

**5.      Paul's interpretation impermissibly requires us to rewrite or ignore the compensation terms of the Easement Agreement.**

Paul next argues that the amount of compensation in the Easement Agreement (ninety dollars) supports his interpretation that the Easement Agreement provides for only a single corridor or path rather than "a grant of power to consume the entire 137 acres." He cites *Dwyer* for the court's observation that "it does not necessarily follow" that the parties intended to burden their entire property for thirty-two dollars. *See Dwyer*, 374 S.W.2d at 665–66. Paul also argues that the consideration of one dollar per lineal rod is a "pittance" and does not evidence an intent to give "the pipeline company the right to effectively take the entire property." This is not persuasive.

First, the initial ninety dollars was the consideration that Lone Star Gas (Atmos's predecessor) paid in exchange for the multiple pipeline blanket easement vesting it with an interest in the 137 acres and the installation of the first pipeline. Atmos must pay one dollar per lineal rod for each additional pipeline laid. By calling this subsequent consideration a "pittance," Paul is essentially asking us to ignore or

47

render meaningless this language, which we cannot do.  *See Coker*, 650 S.W.2d at 393; *Smith*, 251 S.W.3d at 823.

Second, Paul is taking his quotation from *Dwyer* out of context.  The *Dwyer* court did state that "it does not necessarily follow that the [parties], for a consideration of $32.00, intended to burden their land with an easement [that] might be enlarged over and over again, as often as an increase in demands for gas might make it necessary."  374 S.W.2d at 665–66.  But it made this statement after noting that the parties had made changes to the granting language to make it clear that the pipe could not be removed except upon termination of the easement and while rejecting the pipeline company's argument that it could increase the size of the pipe "every time an increased demand for gas [m]ade such enlargement necessary."  *Id.* at 665.  Rather, the grantee in *Dwyer* obtained a vested interest in the *entire* servient estate until it laid the first pipeline.  Then, "once [the pipeline company] installed the eighteen-inch pipe, its rights became fixed and certain, and the [pipeline company] was not permitted to install a thirty-inch pipe pursuant to the exiting easement."  *Sw. Elec. Power Co.*, 2020 WL 960993, at *7 (discussing *Dwyer*, 374 S.W.2d at 666).

Third, Paul is overstating the implications of a multiple pipeline blanket easement, as we discuss more specifically below.  Atmos is not "consum[ing] the entire 137 acres" or "effectively tak[ing] the entire property" by claiming the Easement Agreement is a blanket easement.  Atmos merely has the right to determine a reasonable route for additional pipelines, if it installs additional lines under the

48

Easement Agreement. Our ruling does not alter the fact that Atmos may not turn its nonpossessory interest in Paul's property into a possessory one. *See Marcus Cable*, 90 S.W.3d at 701–02 ("The common law does allow some flexibility in determining an easement holder's rights. . . . But such changes must fall within the purposes for which the easement was created, as determined by the grant's terms. . . . Otherwise, easements would effectively become possessory, rather than nonpossessory, land interests."). Nor does it free Atmos from the obligation to act reasonably and to impose as little burden as possible on Paul's estate when, or if, it installs an additional line. *See Sw. Elec. Power Co.*, 2020 WL 960993, at \*9.

Accordingly, we reject Paul's argument that the consideration set forth in the Easement Agreement requires us to interpret the grant as requiring all lines laid under it to be in the same corridor as Line W.

### 6. Paul's interpretation impermissibly turns a damages provision into a controlling provision that limits the property that may be burdened by the Easement Agreement.

Finally, Paul points to the language in the Easement Agreement requiring Atmos "to pay any damages which may arise to growing crops or fences from the construction, maintenance and operation of said pipe" to argue that the "parties only intended the easement to be a single lane through the back farmland" where it would "only impact crops or fences." He contends that under Atmos's reading, Atmos could lay a pipeline even through his house and barn. The implication that Paul

49

draws from the damage provision is illogical and ignores the remaining language of the grant.

Paul cites no law supporting his position and provides no explanation as to why the damages provision should be given a controlling effect. Paul's use of the damages provision is contrary to the well-established principle that no provision taken out of its context within all the agreement's terms will be given controlling effect. *See Coker*, 650 S.W.2d at 393.

We recognize that "general provisions of the easement . . . cannot override other, more specific provisions of the easement that spell out in detail the parties' respective rights." *DeWitt*, 1 S.W.3d at 102. But there is no express language in the Easement Agreement that signals Atmos's obligation to pay for damages to growing crops or fences is a limitation on the location of pipelines. For this reason, this is not a situation where a specific provision in a contract controls over a general provision. One provision identifies the property burdened by the easement (the entire 137 acres). A portion of a completely different paragraph concerns damages payable due to the construction, maintenance, and operation of pipelines. *See, e.g., Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994) (op. on reh'g) ("[W]hen a contract provision makes a general statement of coverage, and another provision specifically states the time limit for such coverage, the more specific provision will control."). Stated differently, the grant of the right-of-way and easement over and through the entire 137 acres is consistent with, and not limited by, the damages provision. One

provision is not more specific of another; they concern different things. Paul's interpretation requires us to impermissibly render the broad property description meaningless. *See Coker*, 650 S.W.2d at 393; *Smith*, 251 S.W.3d at 823.

Further, the fact that the grantor is not required to maintain crops and fences in any specific location in perpetuity (when the property description contains no reference to crops and fences) bolsters our conclusion that this damages provision does not limit the location of pipelines. Interpreting this Easement Agreement as wedding the location of pipelines to the location of movable crops and fences is not reasonable because, among other reasons, it contains no description of where such crops and fences are located or that any such items even existed at the time. Moreover, Paul owns only a portion of the 137 acres. There is no summary-judgment evidence as to the location of any crops, fences, houses, or barns, if any, in 1960 anywhere along or within the 137 acres.[13]

Finally, the omission of houses and barns in the Easement Agreement's damage provision cannot be construed as evidencing an intent that the pipelines be laid only where no such structures exist. "[E]asements must be construed most strongly against the grantor, and most favorably to the grantee, so as to confer the largest estate which a fair interpretation will permit." *Wood v. Coastal States Crude*

---

[13]Some instruments may specify a location for an easement by referencing movable objects or landmarks, such as a fence, existing at the time of the grant. Nothing in our opinion should be construed as rendering such easements invalid or ambiguous.

*Gathering Co.*, 482 S.W.2d 954, 956 (Tex. App.—Corpus Christi–Edinburg 1972, writ ref'd n.r.e.) (citing *Stevens v. Galveston, H & S.A. Ry. Co.*, 212 S.W. 639 (Tex. Comm'n App. 1919, judgm't adopted)); *see also Gladewater Cty. Line ISD v. Hughes*, 59 S.W.2d 351, 354 (Tex. App.—Texarkana 1933), *aff'd*, 76 S.W.2d 471 (Tex. [Comm'n Op.] 1934) ("It is especially the rule applicable to the construction of grants that a deed will not be construed to create an estate on condition or limitation unless language is used which, according to the rules of law, from their own force, imports a condition or limitation or the intent of the grantor to make a conditional estate is otherwise clearly and unequivocally indicated."). Thus, if the parties intended to limit the location of pipelines to where the grantor had crops and fences, then they needed to state so expressly in the instrument. They did not.

Accordingly, we reject Paul's argument that the fact that the Easement Agreement requires the pipeline company to pay for damages only to "growing crops or fences" evidenced the original contracting parties' intent that all pipelines laid under the grant would be in "a single lane through the back farmland."

**D.  We can construe the Easement Agreement as a matter of law because it is not ambiguous.**

Both parties assert that their interpretation of the Easement Agreement is the only reasonable one; neither party contends that the Easement Agreement is ambiguous. Paul, however, half-heartedly makes one ambiguity argument, which we must address.

52

Paul briefly contends "at worst . . . the easement agreement is ambiguous" and cites *Harrington v. Magellan Pipeline Company*, No. 10-09-00131-CV, 2011 WL 6225276, at *2 (Tex. App.—Waco Dec. 14, 2011, no pet.) (mem. op.), to support his position. In *Harrington*, an easement granted "the right of way, or easement and privilege, to lay, repair, maintain, operate and remove pipelines" "over and through my lands." *Id.* at *1. Additional compensation was required for any additional lines. *Id.* at *2. The landowners argued that the easement did not allow the grantee an unlimited right to install pipelines in any location and in any direction within the 100-acre tract of property because it granted "the right of way." *Id.* The *Harrington* court cited *Dwyer* for the proposition that a grant of a right-of-way set out in general terms without specifying the exact place for its location becomes fixed and certain when the pipeline is laid. *Id.* It distinguished *Dwyer* because *Dwyer* involved only a single line. *Id.* *Harrington* then recited general principles governing the existence of an ambiguity in a contract and abruptly concluded, "Because the 1919 Easement grants a single right of way but allows for multiple pipelines, it is ambiguous whether the original grantor intended to burden his land by allowing additional pipelines to be laid in any location on the property." *Id.* To the extent that Paul relies on *Harrington* to argue that the Easement Agreement is ambiguous, we disagree with that case's holding.

The *Harrington* court made no attempt to substantively analyze the law governing easements and never cited or discussed *Dwyer* again. It appears to us that, like Paul, the *Harrington* court misconstrued "right-of-way" to mean path. For the

53

reasons explained above, a grant is not ambiguous simply because it grants "the right-of way" and "easement" for the grantee to lay multiple pipelines when the grant does not (1) identify the route or routes for such lines within a larger area of land or (2) clearly state that multiple "routes" are authorized. "Right-of-way" does not simply mean a single path. *See Sw. Elec. Power Co.*, 2020 WL 960993, at *8 ("The use of a general easement without a fixed width is a strategic decision that does not render an easement ambiguous or require a court to supply the missing term." (citing Restatement (Third) of Property (Servitudes) § 4.10 (2000))).

In another section of his brief, Paul makes another argument suggesting that the Easement Agreement is ambiguous. He argues that the probate court's ruling must be affirmed because Atmos "failed to challenge [his] construe-against-the-drafter ground for awarding judgment," and he had argued in the probate court that any ambiguity must be resolved in his favor because Atmos drafted the agreement. We disagree. Paul moved for summary judgment on only a single ground: "As a matter of law, the 1960 Easement Agreement does not cover the New Pipeline." Paul's construe-against-the-drafter argument was merely a rule of construction that he advanced in connection with his ambiguity arguments; it was not an independent ground for summary judgment. Atmos adequately addressed this argument in its opening brief by arguing that the Easement Agreement is not ambiguous and that easements are to be construed most strongly against the grantor, and most favorably to the grantee, so as to confer the largest estate that a fair interpretation will permit.

54

*See Wood*, 482 S.W.2d at 956; *Peterson v. Barron*, 401 S.W.2d 680, 685 (Tex. App.—Dallas 1966, no writ); *Gladewater*, 59 S.W.2d at 354. As Atmos also points out on appeal, there is no summary-judgment evidence demonstrating who drafted the agreement to support Paul's argument.

Accordingly, we reject Paul's ambiguity argument and conclude as a matter of law that the Easement Agreement is not ambiguous because it can be given a certain, definite meaning and is susceptible of only one reasonable interpretation. For all the reasons set forth above, Paul's predecessors-in-title agreed to a multiple pipeline blanket easement. Atmos is authorized to install Line WD, an additional line, under the Easement Agreement, and the new line's location is not defined by the location of Line W, the first line laid. *See Childress*, 187 S.W.2d at 940. We cannot rewrite the Easement Agreement to limit the route of all pipelines to the location of the first pipeline laid or to change the compensation terms simply because Paul does not like the agreement of his predecessors. *See Shields Ltd. P'ship*, 526 S.W.3d at 486; *Fortis Benefits*, 234 S.W.3d at 649; *Rubinstein*, 497 S.W.3d at 625; *see also Sw. Elec. Power Co.*, 2020 WL 960993, at *8 ("Consistent with the recognition of general easements in Texas, courts have long been reluctant to write fixed widths into easements when the parties to the easements never agreed to a particular width.").

55

**E.** **Because the Easement Agreement is not ambiguous, we cannot look to extrinsic evidence to vary its terms or to create an ambiguity. The parties' disputes about the location of Line X and statements made by an Atmos agent regarding the width of an easement are irrelevant.**

In an attempt to support his interpretation of the Easement Agreement, Paul goes beyond its four corners to argue that evidence of Atmos's past conduct evidences the "parties' intended meaning of the agreement." Specifically, he argues that "the use of the pipeline easement confirms the parties' intended meaning of the agreement." He points to the installation of Line W along the southern boundary of his property in 1960, the alleged more recent statements of Atmos's agent about the easement being a fifty-foot strip of land running with Line W and that Paul could not build dog kennels within that strip, and the installation of Line X ten feet away from and parallel to Line W. Other than the location of Line W, Atmos disputes these facts.

The evidence on which Paul relies is inadmissible parol evidence because, as we conclude above, the Easement Agreement is not ambiguous. *See* Tex. R. Civ. P. 166a(c), (f). "If the contract language is not fairly susceptible of more than one legal meaning or construction, . . . extrinsic evidence is inadmissible to contradict or vary the meaning of the explicit language of the parties' written agreement." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex. 1995) (op. on reh'g); *see also Sw. Elec. Power Co.*, 2020 WL 960993, at *8 ("[T]he lack of a specified width in an easement does not mandate the admission of extrinsic evidence to

56

prescribe a width—doing so obviates the flexibility that general easements afford the parties who bargained for the terms of an express general easement."); *Singer v. First Baptist Church, Carrollton, Tex.*, No. 2-05-361-CV, 2006 WL 1920346, at *3 (Tex. App.—Fort Worth 2006, no pet.) (mem. op.) ("When a deed is intended as a complete memorial of a legal transaction, parol evidence is inadmissible to . . . explain or vary the terms of the deed."); *Crawford*, 250 S.W.2d at 240 ("[P]arol evidence was not admissible to show the meaning of the contract when such meaning was clear from the contract itself."). Additionally, when a contract is unambiguous, we may not consider the parties' course of performance to determine the contract's meaning. *See Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 206 (Tex. 2019); *see also Sw. Elec. Power Co.*, 2020 WL 960993, at *8 ("If the easement's terms are ascertainable and can be given legal effect, courts will not supplant the easement's express terms with additional terms nor consult extrinsic evidence to discern the easement's meaning."); *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 453 (Tex. 2015) (op. on reh'g) (rejecting a party's acquiescence to disputed fee as informing the meaning of a disputed contract term because "[a] party's interpretation of an agreement is parol evidence and cannot be used to create ambiguity or show motive").

Thus, facts about the location of Line X and statements made by an Atmos agent about the width of the easement are not admissible to ascertain the intent of the parties, to create an ambiguity, or to vary the terms of the Easement Agreement. *See Friendswood Devel. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex. 1996); *Nat'l Union*

*Fire Ins. Co.*, 907 S.W.2d at 520. This evidence is immaterial, and we cannot consider it when interpreting the Easement Agreement.

Moreover, the evidence relating to the location of Line X and the statements of an Atmos agent would not change the outcome even if it had been uncontroverted, although it was. At the time the Atmos agent supposedly told Paul that the easement was a fifty-foot strip of land running with Line W, the only pipeline that Atmos had installed at that time was Line W. Under Paul's evidence, Atmos installed Line X after these events. At best, the agent's comments were nothing more than evidence of his understanding about the width of the easement that Atmos claimed was reasonable and necessary to maintain and operate *Line W*. It was not a comment about the width of an easement with respect to any other pipelines because no other Atmos pipelines existed yet. His statements do not constitute limitations on Atmos's rights under the Easement Agreement, nor do they demonstrate that what Atmos did later with respect to *Line WD* contradicted what the agent said.

The same is true with respect to Line X. Even if the evidence had been uncontroverted that Atmos installed a new Line X ten feet away from and parallel to Line W, it would not mean that Atmos had no right to lay Line X, Line WD, or any other line on any other reasonable location on Paul's land under the Easement Agreement. As the Supreme Court of Texas has acknowledged, a grant may give a grantee a right in excess of the one actually used. *See Sw. Elec. Power Co.*, 2020 WL 960993, at *7; *Dwyer*, 374 S.W.2d at 665 (citing *Knox*, 321 S.W.2d at 598–602); *see also*

58

*Kachina Pipeline Co.*, 471 S.W.3d at 453.  The language of the Easement Agreement still controls the scope of the conveyance.

Accordingly, we reject Paul's argument that Atmos's alleged prior actions (in installing Line X along the same path of Line W and in stating, through an agent, that its easement was fifty-feet wide) may be used to interpret the Easement Agreement as limiting the location of Line WD to the same corridor as Line W.  The evidence is inadmissible to vary the terms of the Easement Agreement or to create an ambiguity because the grant is unambiguous.

**F.     Paul's arguments about whether Atmos may "spiderweb" or "consume" his property are not persuasive.**

Like in the probate court, on appeal Paul makes numerous statements about the potential consequences of reversing the probate court's summary-judgment ruling. He argues that under Atmos's interpretation, "it has the right to take all of Paul's property," it may create a "spiderweb covering the entire property," that his predecessors-in-title "implicitly gave away the farm[] and the ability to develop it," and that Atmos may "lay its pipelines anywhere on Paul's property, even through Paul's house and barn."  He further contends,

> Atmos's spiderweb reading . . . would have terrible implications far beyond this case.  Landowners across Texas would wake up to find that decades-old easement agreements . . . prevent them from developing their property, . . . decimate the value of their land, . . . render their land unsuitable as collateral for loans, and . . . give pipeline companies a

59

massive windfall by enabling them to lay new lines along new routes for pocket change.[14]

Other than citing Section 111.0194(a) of the Texas Natural Resource Code, Paul cites no authority to support his predictions.[15] We do not consider these arguments relevant or persuasive.

We are sympathetic to Paul's concerns. But we are guided by long-standing precedent of Texas law governing multiple pipeline blanket easements. We must be wary of working a sea change in precedent, especially one that disturbs the principles of property law. *See Wessley Energy Corp. v. Jennings*, 736 S.W.2d 624, 628 (Tex. 1987) ("[W]e are mindful of the necessity that property rights must remain stable and free from changing doctrine."); *Couch v. S. Methodist Univ.*, 10 S.W.2d 973, 974 (Tex. Comm'n App. 1928, judgm't adopted) ("[P]ublic policy . . . favors the utmost liberty

---

[14]The Texas Farm Bureau filed an amicus brief arguing that Atmos's theory of easement interpretation is unreasonable because it "threatens countless Texas landowners with the possibility [and extreme degrees of uncertainty and unpredictability] that new pipelines can pop up anywhere on their property at any time" without fair compensation, if any.

[15]Section 111.0194 of the Texas Natural Resource Code applies to an easement granted to "a single common carrier pipeline" and provides, in relevant part, that "[u]nless the terms of the grant . . . expressly provide otherwise, . . . an easement created through grant . . . is presumed to create an easement . . . that extends only a width of 50 feet as to each pipeline laid under the grant." Tex. Nat. Res. Code Ann. § 111.0194. There is no evidence in the summary-judgment record that Atmos is a common-carrier pipeline. *See id.* Regardless, this statute, which went into effect on January 1, 1994, merely concerns the width of the easement as to "each pipeline laid" under the grant. *See id.* § 111.0194(a). The plain language of the statute does not retroactively render void multiple pipeline blanket easements or require all pipelines laid under such an easement to be laid within the same fifty-foot-wide corridor.

of contract and freedom of land titles from conditions or restrictions which would work a forfeiture or materially impair their values."). Our interpretation of the Easement Agreement changes nothing about the status of that law.

Paul's protection comes from the fact that Atmos remains bound by Texas's version of the rule of reasonableness, which we discuss above. *Sw. Elec. Power Co.*, 2020 WL 960993, at *9; *Coleman*, 514 S.W.2d at 903. This is consistent with the *Dwyer* court's statement that "the holder of an easement is entitled to full enjoyment thereof and, when the purpose or object of the easement is stated in general terms, the holder has the right to employ whatever means may be reasonably necessary for its full enjoyment." 374 S.W.2d at 665.[16]

This court is precluded from rendering void by judicial decree the rights Paul's predecessors granted to Atmos. It is the function of the legislature to declare the public policy of this state.[17] *See Teal Trading & Dev., LP v. Champee Springs Ranches Prop.*

---

[16]*See Cozby v. Armstrong*, 205 S.W.2d 403, 407 (Tex. App.—Fort Worth 1947, writ ref'd n.r.e.) ("If an easement in land is granted in general terms, without giving definite location and description to it, . . . [t]he right to locate belongs to the owner of the servient tenement, but he must exercise it in a reasonable manner, having due regard to the rights and interests of the owner of the dominant estate."); *see also Grobe v. Ottmers*, 224 S.W.2d 487, 489 (Tex. App.—San Antonio 1949, writ ref'd n.r.e.) (stating that if grantor fails to select location of easement, then the grantee may do so with regard for the convenience of all parties; the location of the right-of-way may be established by the acquiescence of the parties); *accord Vinson v. Brown*, 80 S.W.3d 221, 228 (Tex. App.—Austin 2002, no pet.) (same).

[17]Some states have passed legislation prohibiting or inhibiting blanket easements created after a certain date. *See, e.g.*, Minn. Stat. Ann. § 301B.03 (requiring public service corporations to, among other things, "definitely and specifically

61

*Owners Ass'n*, No. 17-0736, 2020 WL 499243, at \*10 (Tex. Jan. 31, 2020) ("Courts should refrain from nullifying a transaction because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law." (quotation marks omitted)); *Lawrence v. CDB Servs., Inc.*, 44 S.W.3d 544, 553 (Tex. 2001) (stating that "[c]ourts must exercise judicial restraint in deciding whether to hold arm's-length contracts void on public policy grounds" and that "the factually-intensive, competing public policy concerns raised by the parties and by *amici* in [workers' compensation] cases are not clearly resolved by [a] statute and are best resolved by the Legislature, not the judiciary"), *superseded by statute*, Tex. Lab. Code Ann. § 406.033(e), *as recognized in Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192

---

describe" property acquired by an easement—after the statute's enactment in 1973, *see Scherger v. N. Nat. Gas. Co.*, 575 N.W.2d 578, 581 (Minn. 1998)—and limiting the easement to the "width necessary for the safe conduct of their business"); Mo. Rev. Stat. § 523.282 (declaring void and unenforceable as against public policy "blanket easements" created after 2006, meaning an easement where the "instrument or order of condemnation, by its terms, allows the easement holder to locate its facilities at an undefined location on, over, under, or across the burdened property" and that does not contain certain language fixing the burden, scope of use, and footprint based on the completion of an initial structure and fixing the location of the burden to the degree occupied by an initial structure); Wyo. Stat. Ann. § 34-1-141(a), (b) (declaring null and void easements executed and recorded after March 24, 2006, that "do not specifically describe the location of the easement" or that grant the right to locate an easement at a later date and the specific description is not recorded within one year). *But cf.* W. Va. Code Ann. § 36-3-5a (permitting oil and gas, gas storage and mineral leases to only describe the land on which the easement or right-of-way will be situated). Indeed, as Paul points out, Texas's Legislature passed Section 111.0194 of the Texas Natural Resource Code, which provides a rebuttable presumption that certain easements granted to "a single common carrier pipeline . . . extend[] only a width of 50 feet as to each pipeline laid under the grant." Tex. Nat. Res. Code Ann. § 111.0194.

(Tex. 2004); *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620, 628 (Tex. 2004) ("Generally, the State's public policy is reflected in its statutes." (quotation marks omitted)). Our interpretation of the Easement Agreement is consistent with well-established Texas law governing property rights, contract interpretation, and the freedom of contract.

We cannot alter the express terms of the Easement Agreement based on Paul's fears about a hypothetical future. It is not the function of this court to judicially insert a limitation upon the location of all pipelines that may be (or have already been) laid under all easements worded like the Easement Agreement, let alone to do so retroactively. Today, we are asked to decide only whether Paul conclusively established that he did not breach the agreement as a matter of law by refusing Atmos access to his property to install Line WD.

Accordingly, for all the foregoing reasons, we hold that as a matter of law, the plain language of the Easement Agreement unambiguously evidenced the original contracting parties' intent for the grantor to convey to the grantee a multiple pipeline blanket easement that does not require all pipelines laid under the grant to be laid in the same corridor as the first line laid.

## G.  Paul did not conclusively establish that Atmos's installation of Line WD unreasonably burdens his property.

We now turn to the question of whether Paul conclusively established that the route selected by Atmos for Line WD unreasonably burdens his property. *See*

*Severance*, 370 S.W.3d at 721; *Coleman*, 514 S.W.2d at 903; *Taylor Foundry*, 51 S.W.3d at 770; *San Jacinto Sand Co.*, 426 S.W.2d at 344–45. We conclude that (1) Paul did not raise this issue in his summary-judgment motion and (2) even if he had, he did not carry his summary-judgment burden.

Paul based his motion solely on his contention that the Easement Agreement does not cover Line WD—a position that we reject above. When Paul moved for summary judgment, he did not argue in the alternative that if the Easement Agreement permits Atmos to install Line WD outside the corridor of Line W, then the location of Line WD unreasonably burdens his estate. Paul raised his unreasonable-burden argument for the first time in his summary-judgment reply. But "new grounds for summary judgment asserted by a movant in a reply . . . are not properly considered on appeal." *Miller v. Great Lakes Mgmt. Serv., Inc.*, No. 02-16-00087-CV, 2017 WL 1018592, at *5 n.8 (Tex. App.—Fort Worth Mar. 16, 2017, no pet.) (mem. op.); *Sanchez v. Mulvaney*, 274 S.W.3d 708, 711 (Tex. App.—San Antonio 2008, no pet.) ("[A] movant may not use a reply brief to meet the specificity requirement or to assert new grounds for summary judgment."). Because we resolved the interpretation question against Paul and because Paul did not address the reasonableness question in his motion, he failed to conclusively establish as a matter of law that he did not breach the Easement Agreement by denying Atmos access to install Line WD. Thus, we conclude that the trial court erred by granting a take-nothing summary judgment against Atmos.

64

We reach the same result even if we construe the arguments in Paul's summary-judgment motion as fairly including a challenge to whether Line WD unreasonably burdened his property. He submitted an affidavit wherein he referred to a map showing Line WD's location on his property:



He then simply testified by affidavit, "the location of [Line WD] severely impacts [his] ability to develop the [p]roperty to its highest and best use," without explanation.

Paul's testimony is not competent summary-judgment evidence because it is conclusory. *See* Tex. R. Civ. P. 166a(f); *Lindley v. McKnight*, 349 S.W.3d 113, 126 (Tex. App.—Fort Worth 2011, no pet.) ("Conclusory statements are not proper summary judgment proof. A conclusory statement is one that does not provide the underlying

facts to support the conclusion." (citations omitted)); *Trend Gathering & Treating, LP v. Moore*, No. 10-10-00136-CV, 2010 WL 4983488, at *3 (Tex. App.—Waco Dec. 1, 2010, no pet.) (mem. op.) (expert's opinion on "highest and best use" of property was "conclusory" when expert "merely state[d] his conclusion without providing any analysis"); *Jimmie Luecke Children P'ship, Ltd. v. Pruncutz*, No. 03-03-00388-CV, 2005 WL 910144, at *3 (Tex. App.—Austin Apr. 21, 2005, pet. denied) (mem. op.) (holding that affiant's statement that "the highest and best use of the property would be to maintain it as one large tract" was conclusory because it presented "his subjective beliefs and conclusions without providing supporting facts"). Paul did not submit any summary-judgment evidence on any attempted development of his property that was thwarted by Line WD. To the contrary, the summary-judgment evidence reflects that pursuant to the PUA (which is not part of the record), Paul allowed Atmos access to his property to install Line WD after Atmos filed suit.[18]

Moreover, the Miller affidavit offered controverting testimony explaining the many factors that Atmos considered when deciding upon the route of Line WD, including—as Paul's own image shows—planning around obstacles such as Paul's barn and home. Thus, even if Paul did submit competent summary-judgment evidence, a genuine issue of material fact existed regarding the reasonableness of route

---

[18]Paul admitted in response to a request for admission, "Atmos currently uses part of [his] land under [the PUA] that is conditioned on the Court's rulings on Atmos's right to use the land, either under the Easement (as Atmos contends) or through its power of eminent domain (which [Paul] insists is the only possible basis for Atmos's continued use of the land)."

Line WD, precluding summary judgment on this basis. *See* Tex. R. Civ. P. 166a(c); *Van*, 990 S.W.2d at 753.

For the above reasons, we conclude that Paul did not meet his initial summary-judgment burden to conclusively establish as a matter of law that Line WD unreasonably burdens his property. *Frost Nat'l Bank*, 315 S.W.3d at 508. Even if he had, we conclude that Atmos's summary-judgment evidence demonstrated a genuine issue of material fact that made summary judgment improper. Thus, Paul did not conclusively negate the breach element to Atmos's contract claim as a matter of law. *See* Tex. R. Civ. P. 166a(b), (c).

Because the Easement Agreement does not require Line WD to be laid in the same corridor as Line W, and because Paul failed to conclusively establish that the route of Line WD unreasonably burdens his property as a matter of law, we conclude that the probate court erred by granting summary judgment and rendering a take-nothing judgment against Atmos. We sustain Atmos's sole issue.

Atmos requests that we remand this case for further proceedings. Accordingly, we will reverse the judgment of the probate court and remand this case for further proceedings.

## VII.   CONCLUSION

Having sustained Atmos's sole issue, we reverse and remand this case to the probate court for proceedings consistent with this opinion.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  March 5, 2020